IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION


LISA MARIE STONE,                    )          CIVIL ACTION 4:06-1840-GRA-TER
                                     )
            Plaintiff,               )
                                     )
       v.                            )
                                     )          REPORT AND RECOMMENDATION
MICHAEL J. ASTRUE,[1]                )
COMMISSIONER OF SOCIAL               )
SECURITY,                            )
                                     )
            Defendant.               )
_____    )


       This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended,

42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of

Social Security, denying plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental

Security Income (SSI). The only issues before the Court are whether the findings of fact are

supported by substantial evidence and whether proper legal standards have been applied. This case

was referred to the undersigned for a report and recommendation pursuant to Local Rule

73.02(B)(2)(a), (D.S.C.).

---

[1]  Michael J. Astrue became the Commissioner of Social Security on February 12, 2007.
Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be
substituted for Commissioner Jo Anne B. Barnhart as the defendant in this suit.

# I.  PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on March 12, 2004. (Tr. 70-73). Plaintiff claimed she had been disabled due to depression with tremors and a bipolar disorder. Her applications were denied initially and upon reconsideration. (Tr. 29-30). Plaintiff filed a timely request for a Hearing. Following a hearing, the Administrative Law Judge ("ALJ") found, in a decision dated February 24, 2006, that plaintiff was not disabled because she retained the residual functional capacity (RFC) to perform a significant range of unskilled work activity. (Tr. 26). The Appeals Council's denial of plaintiff's request for review of the ALJ's decision made it the Commissioner's final decision for purposes of judicial review under 42 U.S.C. § 405(g). See 20 C.F.R. §§ 404.981, 416.1481 (2002).

# II.  FACTUAL BACKGROUND

The plaintiff was born on January 1, 1967, (Tr. 284-285) and was 38 years of age on the date of her hearing before the ALJ.  She completed high school and one year of college. Her past work experience includes photo lab technician, cashier, and delivery driver.

# III.  DISABILITY ANALYSIS

The plaintiff's arguments consist of the following:

(1)     The ALJ conducted a faulty Listing analysis.

(2)     The ALJ erroneously afforded little weight to the opinion of plaintiffs' treating physician; and

(3)     The ALJ violated the Code of Federal Regulations by failing to consider the effects of plaintiff's numerous psychotropic medications upon her ability to work on a regular and consistent basis.

(Plaintiff's brief).

In the decision of February 24, 2006, the ALJ found the following:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's depression with tremors and bipolar disorder are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant has the ability to perform a significant range of unskilled work activity as described above.

7.  The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

8.  The claimant is a "younger individual" (20 CFR § 404.1563 and 416.963).

9.  The claimant has "more than a high school (or high school equivalent) education" (20 CFR §§ 404.1564 and 416.964).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case. (20 CFR §§ 404.1568 and 416.968).

11. Although the claimant's exertional limitation does not allow her to perform the full range of unskilled work, using Medical-Vocational Rule 204.00 as a framework for decision-

making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as a cleaner-industrial setting which is unskilled and medium exertional level (DOT 387.687-014), with 25,760 jobs existing in the state of South Carolina and 2,100,000 jobs existing nationally; as a machine tender which is unskilled and at the medium exertional level (DOT #920.685-078), with 6,210 jobs existing in the state of South Carolina and 926,000 jobs existing nationally; as a hand packer which is unskilled and at the medium exertional level, with 3,740 jobs existing in the state of South Carolina and 680,000 jobs exiting nationally; as a sorter which is unskilled at the light exertional level, with 2000 jobs existing in the state of South Carolina and 140,000 existing nationally; and production helper which is unskilled and medium exertional level, with 11,350 jobs existing in the state of South Carolina and 1,767,000 jobs existing nationally.

12.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(Tr. 26-27).

The Commissioner argues that the ALJ's decision was based on substantial evidence and that the phrase "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 390-401, (1971). Under the Social Security Act, 42 U.S.C. § 405 (g), the scope of review of the Commissioner's final decision is limited to: (1) whether the decision of the Commissioner is supported by substantial evidence[2] and (2) whether the legal conclusions of the Commissioner are correct under controlling law. Myers v. Califano, 611 F.2d 980, 982-83 (4th Cir. 1988); Richardson v. Califano, 574 F.2d 802 (4th Cir. 1978). "Substantial evidence" is that evidence which a "reasonable mind might accept

---

[2]Substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).

as adequate to support a conclusion." Richardson, 402 U.S. at 390.  Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict.  Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).   The Court's scope of review is specific and narrow.   It does not conduct a de novo review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees, so long as it is supported by substantial evidence.  42 U.S.C. § 405 (g) (1982); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

The general procedure of a Social Security disability inquiry is well established.   Five questions are to be asked sequentially during the course of a disability determination.  20 C.F.R. §§ 404.1520, 1520a (1988).  An ALJ must consider (1) whether the claimant is engaged in substantial gainful activity, (2) whether the claimant has a severe impairment, (3) whether the claimant has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments (at 20 C.F.R. Pt. 404, Subpart P, App. 1), (4) whether the claimant has an impairment which prevents past relevant work and (5) whether the claimant's impairments prevent him from any substantial gainful employment.

Under 42 U.S.C. §§ 423 (d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." See 20 C.F.R. § 404.1505(a); Blalock, 483 F.2d at 775.

If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. § 404.1503(a).  Hall v. Harris, 658 F.2d 260 (4th Cir. 1981).  An ALJ's factual determinations must

-5-

be upheld if supported by substantial evidence and proper legal standards were applied.  <u>Smith v. Schweiker</u>, 795 F.2d 343, 345 (4th Cir. 1986).

A claimant is not disabled within the meaning of the Act if he can return to his past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82-62.  The claimant bears the burden of establishing her inability to work within the meaning of the Social Security Act.  42 U.S.C. § 423 (d)(5).  He must make a <u>prima</u> <u>facie</u> showing of disability by showing she was unable to return to her past relevant work.  <u>Grant v. Schweiker</u>, 699 F. 2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.   The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  <u>Id</u>. at 191.

## V.  PLAINTIFF'S SPECIFIC ARGUMENTS

As previously stated, plaintiff argues that the ALJ erred as a matter of law in finding that the plaintiff did not meet mental listing 12.04 and erroneously afforded little weight to the opinion of plaintiff's treating physician, Dr. Lucy Preyer, at Ashley Therapy Associates that plaintiff suffered from the majority of the symptoms set forth in Listing 12.04.  Plaintiff argues the ALJ afforded more weight to the opinions of the DDS medical consultants, because these opinions were very similar to her ultimate finding as to plaintiff's limitations.

-6-

Defendant argues that the ALJ properly determined that plaintiff's affective disorder did not meet the severity of Listing 12.04, specifically as to the "B" criteria. Defendant argues that the ALJ correctly relied on the reports of state agency consultants, Dr. Gorod and Dr. Vidic, to conclude plaintiff's affective disorder only resulted in moderate limitations in activities of daily living and maintaining social functioning. Defendant also argues that the ALJ was correct in not giving controlling weight to Dr. Preyer's assessment of plaintiff's disabling limitations because her findings were inconsistent with the medical evidence of record and not supported by her own office notes.

Listing 12.04, Affective Disorders, is characterized by a disturbance of mood accompanied by a full or partial manic or depressive syndrome. The required level of severity for these disorders is met when the requirements in **both** A and B are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

    1. Depressive syndrome characterized by at least four of the following:
        a. Anhedonia or pervasive loss of interest in almost all activities; or
        b. Appetite disturbance with change in weight; or
        c. Sleep disturbance; or
        d. Psychomotor agitation or retardation; or
        e. Decreased energy; or
        f. Feelings of guilt or worthlessness; or
        g. Difficulty concentrating or thinking; or
        h. Thoughts of suicide; or
        i. Hallucinations, delusions, or paranoid thinking;

OR

    2. Manic syndrome characterized by at least three of the following:
        a. Hyperactivity; or
        b. Pressure of speech; or
        c. Flight of ideas; or
        d. Inflated self-esteem; or

-7-

e. Decreased need for sleep; or

f. Easy distractability; or

g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

h. Hallucinations, delusions or paranoid thinking;

OR

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

1.    Marked restriction of activities of daily living; or

2.    Marked difficulties in maintaining social functioning; or

3.    Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4.    Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

Therefore, in order to meet the requirements of Listing 12.04 (affective disorders), the plaintiff has to show not only that she had been diagnosed as having an affective disorder but also that she had at least two of the functional limitations as listed above in B.

Plaintiff has been diagnosed with depression and Bipolar Affective Disorder. Plaintiff's treating physician for a number of years was Dr. Lucy Preyer. In January 2005, Dr. Preyer completed a form which was an analysis of Listing 12.04, Affective Disorders, that indicated plaintiff has the

following: sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide. Dr. Preyer indicated that the claimant had manic syndrome characterized by pressure of speech, flight of ideas, a decreased need for sleep, and easy distractibiliity. Dr. Preyer found plaintiff suffered with bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes and that she had marked restriction of activities of daily living, and marked difficulties in maintaining social functioning. (Tr. 67-68).

The medicals as set forth by the plaintiff are repeated herein. On October 2, 2002, plaintiff presented to Palmetto Primary Care with mood swings/depression which began years ago. Severity was described as worsening. Associated signs and symptoms were appetite loss and crying. Review of symptoms: mildly depressed due to situational life stressors. Assessment: depression, new (TR 110-11).

Plaintiff was seen for follow up on October 16, 2002, for depression, which originally began six months ago. Severity was described as improving. She had made an appointment with a minister for counseling. Assessment: depression, improving (TR 108-109).

On June 10, 2003, plaintiff presented with diagnosis of bipolar disorder by Dr. Stice. History of present illness included bipolar mood disorder, chronic interstitial cystitis, dysmenorrhea, edema, migraine headache and mitral valve prolapse. Assessment: bipolar mood disorder, migraine headache, stable and mitral valve prolapse, stable (TR 105-107).

Ms. Stone presented to Palmetto Psychotherapy on November 2, 2002, with insomnia, and MNA. She had decreased energy, short term memory and decreased libido. Her fatigue had increased. She also had decreased short term memory. Impression: major depression and post

-9-

traumatic stress disorder (TR 134-135). On November 11, 2002, it was noted that plaintiff responded well to both medications.

She was doing well until her purse was stolen out of her car. Plaintiff was tearful and upset about the incident but was coping. On December 9, 2002, she was called by the person who stole her purse. She was coping well and doing much better (TR 132. By January 6, 2003, it was noted that the increased dose of Effexor was effective. Ms. Stone's real concern was her twelve-year-old daughter. Work was going fine at the photo lab. In February of 2003, plaintiff was out of Medicaid and no longer had insurance. Breakthrough memories were creating a problem. Plaintiff had the same job, which provided job security but made her feel hassled. Breakthrough memories were continuing to cause anger (TR 131).

By April 1, 2003, plaintiff had seen Dr. J. Jenkins for the past four weeks. Plaintiff was fired the day before for not being at work, despite medical excuse until Wednesday. Dr. Jenkins diagnosed her as being bipolar. Plaintiff's daughter was angry and failing in school. Plaintiff agreed after discussing her visits with Dr. Jenkins that she had experienced both manic and depressive episodes on numerous occasions. Her diagnosis was being enlarged to Bipolar Affective Disorder. On April 29, plaintiff and her husband came in to discuss her illness. It was  met with some opposition. This and her illness were discussed. Solutions were explored concerning their future (TR 129-130).

Plaintiff returned on June 9, 2003, and was approved for Lamictal after she started coming down. It was noted that her medication made her sleepy during the day. She was reporting serious marital problems. Her husband was refusing to talk to her except to say "get better." Plaintiff admitted to scraping herself with a steak knife (TR 128).

-10-

On June 24, 2003, Ms. Stone continued to have problems with bipolar disorder. She experienced mixed symptoms of anger, crying, and flight of ideas. Plaintiff found out about the Crisis Stabilization Center and the need for moderate stabilization. She was motivated to go. She was to be written a referral to get her admitted (TR 128).

Plaintiff reported improved sleep and fewer mood swings, and less irritability on June 30, 2003. She was still afraid of crowds of people. Communication was still a problem with her husband. She wanted to go to her mother's house for 2 weeks. Ms. Stone was calmer, and did not appear to be psychotic (TR 127).

On July 15, 2003, it was noted that plaintiff had done well on Zyprexa. She had been at her mother's home for the last two weeks. She had been getting counseling at MUSC. She will return home today with her husband and stepdaughter. It was noted plaintiff was chatty and upbeat without obvious psychosis (TR 127). On July 28, 2003, it was noted Ms. Stone was home for only three days before she left again. She went to a friend and then to her mother. She was still receiving counseling at this time. I was noted that she was calm, pleasant, lucid, and in control.(Tr. 125).

On August 11, 2002, Melinda Harmon, plaintiff's advocate in BPAD group setting, called and stated plaintiff was unhappy with Zyprexa. Ms. Stone also complained about not receiving immediate calls back. She had left home again. She was trying to not compete with eight year old stepdaughter. Plaintiff was seeking marital counseling. It was noted that Ms. Harmon and the physician agreed that she needed to see another psychiatrist. NV: Disengaged from treatment (TR 125-126).

Plaintiff presented to Dr. Lucy Preyer on August 26, 2003, with a history of major depressive disorder and PTSD. Diagnosed BPAD by Dr. James Jenkins. She had manic episodes of conflict and

-11-

rage that was uncontrolled - including episodes of putting fist through walls and yelling and screaming. Plaintiff was positive for self injury. Ms. Stone had a history of sexual abuse by her father (TR 236). On August 31, 2003, it was reported that Ms. Stone's yelling was escalating. Safety plan included staging plaintiff with her mother who can lock up medication. Ms. Stone was not sleeping well. Diagnosis: Rapid cycling BPAD. Ms. Stone's prior suicide attempts were noted. In September of 2003, it was noted that Ms. Stone had suicidal ideation over weekend. Ms. Stone did not feel that she could go home. She did not feel she could deal with outside stressors. Her sleep was fragmented. Plan: She was to stay at mother's home until next appointment (TR 234).

On September 04, 2003, it was noted that it was difficult to tell if plaintiff had made any changes. She seemed withdrawn. Ms. Stone still viewed "taking a drive" as an option. She stated that her marital situation was "killing her." She was sleeping "some." Her mouth was dry from the Lithium. There was some decrease in suicidal ideation. The physician had a long discussion with Ms. Stone and her husband about the diagnosis of BPAD. Ms. Stone was tearful. Her speech was not loud, but rapid and pressured (TR 233).

Plaintiff returned in follow up on September 10, 2003, and was weak and still feeling poorly. She was dizzy and tired. Temperature was 100 degrees. Her senses seemed a little dulled. She had gained 10 pounds. Ms. Stone was less bipolar and more hopeful. She was feeling much better depression wise. She was anxious about returning home. Diagnosis: She smiled spontaneously. Her thoughts were goal oriented. Denied suicidal ideations. Assessment: BPAD (TR 232). The next day Ms. Stone was called about her lab report. She was tearful as a result of a fight with her husband that morning. It was pointed out that her marriage was "keeping her ill" and she agreed. The couple needed therapy (TR 231).

By September 17, 2003, Ms. Stone reported sleeping was decent. Her nausea and dizziness were subsiding. She had no suicidal ideations. Physician's notes: alert, smiles, spontaneously, affect c/w. Diagnosis: BPAD (TR 230).

Dr. Lopez was attending when Ms. Stone was admitted on September 28, 2003. Ms. Stone presented to Trident Medical Center with suicidal thoughts and depression. She had taken an intentional drug overdose. Ms. Stone felt action was "stupid" and for attention. Ms. Stone was stabilized with a charcoal treatment. She was involuntarily committed to Palmetto Behavioral. (TR 135-152).

Psychiatric Evaluation upon admission - Ms. Stone had the diagnosis of Bipolar Affective Disorder and was admitted for marital problems and status-post Seroquel and Klonopin overdose. Ms. Stone had a history of Bipolar Disorder and possibly with an Axis II diagnosis in addition. She had a history of self-mutilation. Mental Status Exam: She was calm and cooperative. Her mood was angry and her affect was congruent. She reported suicidal ideation on admission but no homicidal ideation. Insight and judgment were poor. Diagnostic Impression: Axis I: Bipolar Affective Disorder type II, depressed. Marital problems. Axis II: Rule out Personality Disorder (TR 155-157). Discharge Summary - Dated October 01, 2003 - Significant Psychiatric Findings: Decreased mood, increased irritability, increased mood swings, marital discord and overdose. Ms. Stone was discharged without suicidal or homicidal ideation or auditory/ visual hallucinations (TR 153-154).

Ms. Stone was sleeping hard and had difficulty getting up in the morning. She felt "disconnected" and ashamed. Her suicide attempt was discussed and it was questioned whether it was for spite because she was angry about abandonment. Discussed current living arrangements and status of marriage. Affect more level. The plan was to continue her medications (TR 228).

On October 23, 2003, Ms. Stone reported her mood had been fairly level but still felt somewhat "detached." She was concerned about her daughter self-mutilating. She continued to feel irritable but was handling it differently. She was seeing a marriage counselor at church. Ms. Stone had no suicidal ideations. She had lost some weight. Ms. Stone was pleasant, calm, nonagitated (TR225).

On November 9, 2003, she reported feeling a tremendous amount of stress. She was not sleeping (TR 224). The next day Ms Stone called reporting that she was able to get some sleep, but wished that her father had not called her back and that he said he felt as if he was bipoloar (TR 224). Two days later, it was reported that Ms. Stone had cut herself on upper right thigh two days ago. Her father called her drunk. She said that he turned to her when he was desperate. She reported feeling alone. Her husband no longer wanted to talk with her. Her mood chart revealed mostly highs on anger. Depression had been bad. She felt she had too much to deal with at once (TR 226).

On November 18, it was noted that during a phone call, Ms. Stone seemed like a different person from two weeks prior. She was depressed and withdrawn. There was a visible difference and her eyes were glassy. She related her depression to her father (TR 227).

On December 8, 2003, Ms. Stone called regarding medication. She reported greatly slurred speech and sleeping almost all day. Her depression was getting worse (TR 222). Eight days later she reported that she was "hanging in there." Ms. Stone reported that some days her mood was fine and some days it was bad. Ms. Stone reported headaches often from tension. She said it was hard to keep her hygiene up. She reported that it was always this way at Christmas for her. Her affect was subdued but in normal range (TR 220-221). Ms. Stone followed up on January 19, 2004, reporting that her hand was shaking. Her speech was slow and intermittently slurred. Husband still noted some

-14-

irritability. She noted frustration with kids but was participating in an anger management class. She had watery diarrhea at times and could not eat. Husband noted that she was sleeping to excess. The physician noted that she was pleasant, calm and sedated and that her speech was not slurred. Some tremors were noted. Assessment: BPAD relatively stable (TR 217).

On January 23, 2004, it was noted that Ms. Stone was still depressed (TR 215). On February 09, 2004, Ms. Stone stated that she would drive herself to the hospital before hurting herself. She had a sinus infection and started running a fever which took three days to resolve. She realized this can affect mood. She was attending a Bipolar Support Group. Ms. Stone had been in a depressed mood for 2-3 weeks. Ms. Stone was offered Crisis Stabilization but she refused for now. She was not committed. By February 12, 2004, Ms. Stone reported feeling better and that she was getting marriage counseling. She was still having a hard time getting up in the morning. Assessment: BPAD doing fairly well (TR 211). Less than two weeks later, Ms. Stone was in crisis. She had an outburst at marriage counseling. She was tearful (TR 209).

On March 9, 2004, it was noted that Ms. Stone reported having a rough three to four days. Stepdaughter was back at home. Ms. Stone felt her husband was drawing away from her. She threw glasses and cups at him. She reported "racy thoughts " for 3 days. She felt that she knows how to handle the situation. The physician discussed black and white thinking with her (TR 207). The treatment center did not hear from Ms. Stone for the next two weeks and became concerned (TR 205). On March 31, 2004, Ms. Stone reported two episodes of depression and dysphoria. She was having vivid dreams. She was napping during the day. Her diarrhea had stopped so she could now eat during the day.

-15-

By April 14, 2004, it was noted that Ms. Stone's cycling was bad. She was depressed, throwing things, and agitated. She wanted cycling to stop. She was close to being suicidal. Husband said that he had to protect the kids from her which devastated her. It made her feel like the "bad guy" (TR 203). The next day she reported having gotten some sleep, but was still weepy. Husband did not know how to handle illness. She felt punished because his knee jerk reaction was to ignore her. Ms. Stone was full of rage and experiencing rapid cycling. The physician discussed possible ways he could respond that were not inflammatory (TR 202).

The physician met with Ms. Stone and her husband on April 23, 2004. They had a fight on the way over. She was having a hard time waking up. The physician discussed at length that suicide was not an option. Ms. Stone's affect was tearful (TR 200). Over the next few weeks, Ms. Stone seemed OK (TR 198). On June 4, 2004, she continued with bad headaches and depressed mood, but no outbursts. Assessment: BPAD fairly stable and probable ADD (TR 197-198).

On June 25, 2004, Ms. Stone went to the doctor because the headaches were worse. She was still experiencing problems with her husband, but they were talking. She was moving in with her sister (TR 195). On July 16, 2004, Ms. Stone was doing well. She had no episodes of rage for five days. She was moving in with her sister. On good days she could focus, talk, and had lots of energy. Assessment: BPAD and ADD (TR 196). By the 30 of this  same month, Ms. Stone reported that she had been in bad shape all week. She was arguing with her husband and found out that her thirteen-year old daughter was sexually active with a 21-year old. She refused to return home and the situation turned violent. Husband had to pull Ms. Stone off of daughter. Ms. Stone decided to take family members and confront 21 year old (TR 194).

-16-

By August 10, 2004, Ms. Stone reported being depressed for several days. She was still getting angry easily and quickly although it took longer and the episodes were not as frequent. Ms. Stone was sleeping. She noticed difference with Adderol. She was experiencing daily thoughts of superficial cutting (TR 192).

Based on the medical evidence, the undersigned finds that plaintiff has clearly met part A of the Listing, but she must also meet part B as set out above.  As stated, Dr. Preyer concluded plaintiff suffered with "marked" restriction of daily activities and "marked" restriction in maintaining social functioning.

The ALJ found the following:

> Based on the evidence of record, the Administrative Law Judge finds the claimant's depression with tremors and bipolar disorder constitute "severe" impairments within the meaning of the Regulations but not "severe" enough to meet or medical equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.
>
> In reviewing the claimant's mental impairments, the undersigned specifically considered whether the claimant's impairments meet or equal the severity of any impairment contained within the Listing of impairments 12.04 (affective disorder), as well as the other pertinent listings. In finding this listing not met, the undersigned notes that although Dr. Preyer indicated that the claimant had marked limitations in their activities of daily living and marked limitations in her social functioning, her assessment was inconsistent with the findings reported in the claimant's medical records. Specifically, Dr. Preyer diagnosed the claimant with serious symptoms, but it was also noted that the claimant's medication helped. Dr. Stice also stated the claimant improved and responded well on medication. The claimant testified at the hearing that she was able to attend to her activities of daily living, including grocery shopping, driving, cleaning house, doing the dishes, and preparing meals and she was able to take care of her physically disabled sister. Moreover, during a number of examinations with Dr. Preyer, from September 2003 to June 2004, the claimant stated that she had been feeling better. Additionally, Dr.

-17-

Jenkins noted that in March 2003, the claimant was less depressed. Considering the evidence of record as a whole, the undersigned finds that the claimant has moderate limitations in the area of activities of daily living. The undersigned also finds that the claimant has moderate limitations regarding her social functioning. She testified that she interact[s] with her friends at least once a week if not more. Additionally, the claimant noted that she does grocery shopping, attend classes, and attends church. The undersigned finds that the claimant has moderate deficiencies of her concentration, persistence or pace in light of her ability [to] watch television, make hair ties, and crochet. She had the ability to retain 3 out of 3 objects at one and five minutes. She was able to perform serial three's during her September 2003 psychiatric examination. Dr. Rosenshen also reported that the claimant's knowledge was adequate and her remote memory for historical history was intact. Therefore, the undersigned finds that while the claimant's depressive disorder with tremors and a bipolar disorder are severe, it does not meet or equal the criteria of a listed impairment. The reports from Palmetto Primary Care, Palmetto LowCountry Behavioral Health, and Dr. Lucy Preyer mentioned above, have been considered. There are no episodes of decompensation of an extended duration.

(Tr. 22).

The opinion of a physician will be given controlling weight if it is supported by medically accepted clinical and laboratory diagnostic techniques and is consistent with the other evidence in the record. 20 C.F.R. § 404.1527(d) (1997); Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (although not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it); Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983)(a treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time"). Conversely, if a physician's opinion is not supported by medically-accepted clinical and laboratory diagnostic techniques and is not consistent with the other evidence in the record, it will not be given controlling weight. In evaluating how much weight

should be given to the opinion of a physician, the nature and extent of the treatment relationship will be taken into account.  Id.  An ALJ, therefore, must explain his reasons for disregarding a positive opinion of a treating physician that a claimant is disabled. DeLoatche v. Heckler, 715 F.2d 148 (4th Cir. 1983).

The undersigned finds that there is no conflicting medical evidence which could justify ignoring the opinion of Dr. Preyer. There is no contradictory evidence by an examining or treating physician put forth by the ALJ to completely ignore the disability determination as to the analysis of Listing 12.04 by Dr. Preyer. Even though Drs. Stice and Jenkins may have had in their office notes that she had  improved on medication or that she was depressed, this was not  substantial contradictory evidence to ignore Dr. Preyer's conclusions. By history, plaintiff would show improvement one day and would be having a manic episode within a week. Accordingly, the undersigned finds that the ALJ improperly disregarded Dr. Preyer's opinion. Dr. Preyer was the treating physician who had treated plaintiff on a regular and consistent basis for over two years and indicated that in her opinion, plaintiff's depression and bipolar syndrome met the requirements in both section A and B of the Listing. Without medical evidence from a treating or examining physician to contradict Dr. Preyer's conclusion with regard to meeting the Listing, the undersigned finds that the ALJ should have given Dr. Preyer's opinion proper weight. The only contradictory evidence cited by the ALJ in his analysis for discounting Dr. Preyer's opinion was the fact that Dr. Stice had stated in a note that plaintiff's medication was effective, Dr. Jenkins had noted on March 21, 2003, that plaintiff was less depressed, and in a one time psychiatric evaluation, Dr. Rosenshein concluded plaintiff was alert and oriented, retained 3 out of 3 objects at one and five minutes, was able to perform serial threes, her fund of knowledge was adequate, and her remote memory for

historical information was intact. However, the ALJ did not discuss the fact that Dr. Rosenshein also noted that plaintiff's insight and judgment were poor, she had maladaptive coping skills, she had a current GAF of 35, and her impression was bipolar affective disorder type II and depression. (Tr. 155-157). The citations to these three notations by the ALJ in his analysis is not significant contradictory evidence. Additionally, the ALJ indicated that he was rejecting Dr. Preyer's opinion based on the fact that at some of the visits, Dr. Preyer noted plaintiff was doing better or had noted that medication was helping. However, viewed as a whole without taking out pieces of the reports, it appears the plaintiff may have had improvement on one visit to only attempt suicide by the next. Thus, just because plaintiff was doing better at one visit did not mean that she was well or not having any problems. She testified that she still has manic episodes although not as frequent as before since medication adjustment.

The record before the court does not contain medical opinions from any other examining or treating source that significantly contradicts Dr. Preyer's opinion. Therefore, based on Dr. Preyer's conclusion, plaintiff's mental impairments meet both the "A" and "B" functional criteria for active symptoms for significant periods of time. The ALJ's decision is not supported by substantial evidence. Therefore, the undersigned concludes there is substantial evidence in the record, consisting of medical evidence together with the plaintiff's testimonial evidence, that she meets the requirements of Listing 12.04. A claimant who has a severe impairment which meets or equals a listing, and who is not currently engaged in substantial gainful activity, is entitled to disability benefits. Durham v. Apfel, 34 F. Supp. 2d 1371 (N.D. Ga. 1999); see also Smith v. Schweiker, 719 F.2d 723, 725 (4th Cir. 1984) (noting that a claimant's disability is established if his nonexertional condition is a listed impairment in the regulations). Accordingly, reversal is appropriate and the

plaintiff is entitled to benefits. Because reversal is warranted, it is unnecessary for this court to consider the other issues raised by the plaintiff.

## VI.  CONCLUSION

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence, Richardson v. Perales, 574 F.2d at 802.  Even where the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision, Blalock,  483 F.2d at 775.

The undersigned finds that the ALJ's decision was not supported by substantial evidence for the reasons discussed.  It is, therefore,

RECOMMENDED that the Commissioner's decision be REVERSED.


Respectfully submitted,

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

July 30, 2007
Florence, South Carolina


**The parties' attention is directed to the important notice on the next page.**

-21-